❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. 25-968M(NJ) |
| The premises, attached garage, and outbuildings | ) |
| located at 109 Sloan Circle, Beaver Dam, Wisconsin | ) |
| 53916, further described in Attachment A | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before   8/26/2025          *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Honorable Nancy Joseph            .
                                                      *(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     8/12/2025 @ 2:21 p.m.                    *Nancy Joseph*
                                                                        *Judge's signature*

City and state:      Milwaukee, Wisconsin                  Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

### <u>Property to be Searched</u>

The property to be searched is the premises, attached garage, and outbuildings located at **109 Sloan Circle, Beaver Dam, Wisconsin 53916** (the "SUBJECT PREMISES"). The premises a single-story, single-family residence located in a cul-de-sac east of the intersection of De Clark Street and Sloan Circle in Beaver Dam, Wisconsin. The residence is green with a brown shingled roof, a one-car attached garage, and a fenced-in backyard enclosing an above-ground pool, a shed and a small greenhouse. The front door is located south side of the residence facing the driveway which opens onto Sloan Circle. Near the front door is a mailbox clearly labeled with "109." The driveway connects Sloan Circle to a single-car garage attached to the residence.



Case 2:25-mj-00968-NJ    Filed 08/12/25    Page 3 of 37    Document 1

**ATTACHMENT B**

**Information to be seized by the Government**

1. The items, information, and data to be seized from the location[s] described in Attachment A are fruits, evidence, contraband, and/or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1029: Fraud-Access Devices; and/or 18 U.S.C. § 1957: Money Laundering, as described in the search warrant affidavit, including, but not limited to:

> a.  Records and information related to the purchase, sale, possession, use, transfer, or exchange of cryptocurrencies, or the location, address, balance of any cryptocurrency assets or accounts;

> b.  Passwords, private keys, or seed phrases associated with any cryptocurrency assets;

> c.  Cryptocurrency wallets, to include digital wallets, cold storage wallets, paper wallets, or any other form of storing public and/or private keys associated with cryptocurrency assets;

> d.  Records or information related to the creation or use of cryptocurrency accounts, wallets, or addresses;

> e.  All documents listed for financial transactions, communications, names, accounts numbers, phone numbers, or other personal identifiers;

> f.  Records and information related to the identity or location of potential victims, witnesses, co-conspirators, or suspects involved in financial fraud schemes;

g.      Records and information related to communications with legitimate cryptocurrency exchanges or other cryptocurrency companies;

h.      Records and information related to Dylan Todd Foote's taxes, finances, and/or any movement of funds, to include data, records, images, documents, programs, applications, or materials tending to show the use of bank accounts, credit card accounts, or other financial accounts;

i.      Personal checks, cashier's checks, deposit slips, check stubs, wire transfer forms, promissory notes, or any other documents demonstrating a transfer of funds from victims or potential victims to Dylan Todd Foote or from Dylan Todd Foote to co-conspirators or potential co-conspirators involved in financial fraud schemes;

j.      Evidence indicating Dylan Todd Foote's state of mind, or that of any potential co-conspirator, as it relates to the crimes under investigation;

k.      Digital devices or storage mediums used as means to commit the violations describe above, to include but not be limited to, cellular telephones, any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to accessing cryptocurrency assets;

l.      For any digital device or storage medium whose seizure is otherwise authorized by this warrant, and any digital device or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Digital Device"), in addition to the items

described in paragraphs 1(a)-1(k), above, the following items will be searched for and seized from these Digital Devices:

      i.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to financial fraud schemes;

      ii.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any money or funds obtained from any individuals or entities;

      iii.      All emails, texts, chats, other communications, documents, photos, videos, and other items or information relating to any efforts to obtain money or funds from any individuals or entities;

      iv.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any financial transactions, transfers, or deposits of funds, cryptocurrency, or purchases of assets or cryptocurrencies;

      v.      Evidence of who used, owned, or controlled the Digital Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat", instant messaging logs, photographs, and correspondence;

      vi.      Evidence of software that would allow others to control the Digital Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

vii.    Evidence of the lack of such malicious software;

viii.    Evidence indicating how and when the Digital Device was accessed or used to determine the chronological context of Digital Device access, use, and events relating to the crime under investigation and to the Digital Device user;

ix.    Evidence indicating the Digital Device user's state of mind as it relates to the crime under investigation;

x.    Evidence of the attachment to the Digital Device of other storage devices or similar containers for electronic evidence;

xi.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Digital Device;

xii.    Evidence of the times the Digital Device was used;

xiii.    Passwords, encryption keys, and other access devices that may be necessary to access the Digital Device;

xiv.    Documentation and manuals that may be necessary to access the Digital Device or to conduct a forensic examination of the Digital Device;

xv.    Records or information about Internet Protocol addresses used by the Digital Device;

xvi.    Records of or information about the Digital Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

23

xvii.     Contextual information necessary to understand the evidence described in this attachment.

2.     As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of digital device or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies).

3.     The term "digital device" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4.     The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMS, and other magnetic or optical media.

5.     This warrant authorizes a review of electronic storage and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

24

6.     During the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) from Dylan Todd Foote at the time of the execution of the warrant, if necessary, to unlock any devices requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristic will unlock the device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

   a.     Any of the devices found at the Subject Premises or on the person of Dylan Todd Foote;

   b.     Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant;

7.     While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned

25

person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any devices or to identify which biometric characteristic (including the unique finger(s) or other unique physical features) unlocks any Devices, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 25-968M(NJ) |
| The premises, attached garage, and outbuildings located at 109 Sloan Circle, Beaver Dam, Wisconsin 53916, further described in Attachment A. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1029 | Fraud-Access Devices |
| 18 U.S.C. § 1957 | Money Laundering |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joshua Eagen, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 8/12/2025

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## AN APPLICATION FOR A SEARCH WARRANT

I, Joshua Eagen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2020. I am assigned to the Joint Terrorism Task Force ("JTTF") and am based out of the Milwaukee Field Office. I am involved in investigations of persons suspected of violations of Federal law in the State of Wisconsin and throughout the United States. I have gained experience conducting investigations through formal training and consultation with local, state, and federal law enforcement agencies as well as from the law enforcement investigations themselves. I have assisted in multiple criminal investigations and participated in numerous search and arrest warrants related to such investigations.

2.      As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2710(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.      The facts in this affidavit come from my personal observations, my training and experience, and from information obtained from other agents, witnesses, and law enforcement officers. This affidavit is intended merely to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A (the "SUBJECT PREMISES") contains evidence

1

of violations of the following statutes (the "SUBECT OFFENSES"), as described in Attachment B:

    a.  Title 18 U.S.C. § 1343 - Wire Fraud
    b.  Title 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Unlawful Activity
    c.  Title 18 U.S.C. § 1029 - Fraud and Related Activity in Connection with Access Devices

## JURISIDCTION

5.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (C)(1)(A). Specifically, the Court is "a district court of the United States… that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711 (3)(A)(i).

## BACKGROUND ON CRYPTOCURRENCY

6.    Based on my training, research, and experience, I am aware that cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat (government-backed) currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-

2

to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction[1]. Cryptocurrency is not illegal in the United States.

7.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 25–26 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

8.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets)

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

3

or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

9. Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively,

4

where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

## **PROBABLE CAUSE**

10.     On January 16, 2025 the Milwaukee Field Office of the FBI opened an investigation into the activities Dylan Todd FOOTE, AKA "OBI," date of birth ("DOB") 09/11/2004, in the wake of a series of swatting[2] incidents which targeted residences in North Carolina, Michigan, Ohio, and Maryland in late 2024 and early 2025.

## **SWATTING INCIDENT IN WILMINGTON, NC**

11.     On September 18, 2024, police officers from the Wilmington Police Department (WPD) responded to [Address 1], Wilmington, NC following a call for emergency services which was determined to have targeted Minor Subject 1, a resident of [Address 1]. Upon interviewing the occupants, the officers learned that Minor Subject 1 had given his address to someone online via a gaming platform.

12.     On September 25, 2025, the Charlotte Field Office of the FBI conducted a "minimal facts" interview with Minor Subject 1 regarding his online activity. Minor Subject 1 stated that he had been active in online groups, chats, and channels on various applications to include Discord and Telegram. Minor Subject 1 had been introduced to at least some of these spaces by an individual that went by the online moniker "OBI" on the video game Roblox. The two of them

---

[2] Swatting is the action or practice of making a prank phone call to emergency services in an attempt to bring about the dispatch of a large number of armed police officers to a particular address or location.

chatted often and became close online friends. Minor Subject 1 provided the following additional pertinent information regarding OBI and noted that OBI used Bitcoin, Ethereum, and Monero to send and receive money.

      a.     Possible first name: Dillon

      b.     Possible age: 20-23 years old

      c.     Phone number: 469-956-9523

13.     According to legal records obtained from Google, 469-956-9523 was associated to a Google voice account, "OpSec G," and email address opsecg307@gmail.com. The recovery email address for this account was listed as johnwicks6322@gmail.com. Additional email addresses were also noted as being associated to the same physical device as johnwicks6322@gmail.com. Included among those email addresses were footedyl49@gmail.com and rocksman233@gmail.com.

14.     According to legal records provided by DoorDash, a DoorDash account associated with email address opsecg307@gmail.com and phone number 469-956-9523 was created on September 12, 2024. This account requested orders to Minor Subject 1's residence on September 12 and 13, 2024. Additionally, on September 16, 2024, this account requested a delivery to 109 Sloan Cir., Beaver Dam, WI 53916.

15.     According to legal records provided by DoorDash, the DoorDash account associated with email address footedyl49@gmail.com, and phone numbers 608-620-4481 and 920-210-0495 was created on October 7, 2023. Between November 22, 2023, and October 22, 2024, this account requested approximately 82 deliveries to 109 Sloan Cir., Beaver Dam, WI 53916. Additionally, between March 21, 2024, and September 2, 2024, this account requested 8

deliveries to [Address 2], Temperance, MI 48182.[3] The physical address for this account was listed as [Address 2], Temperance, MI 48182.

## SWATTING INCIDENTS IN TEMPERANCE, MI AND TRACY'S LANDING, MD

16.    On January 11, 2025, the FBI National Threat Operations Center ("NTOC") received two tips reporting the same general set of facts that FOOTE was responsible for conducting multiple swattings on January 10, 2025. In the first tip, J.B., reported that the FOOTE was responsible for swatting his house, [Address 2], Temperance, MI 48182, as well as his brother's house in Toledo, OH. J.B. also advised that his friend J.K. (online moniker "Caspar"), was previously swatted at his house in Virginia. In addition to the swattings, J.B. advised that FOOTE had also been caught talking to minors (aged 12) on Discord when FOOTE was 19, and that FOOTE was involved in crypto scams, scamming people for well over $50,000. J.B. provided FOOTE's email address as footedyl49@gmail.com, and noted his address was 109 Sloan Circle, Beaver Dam, WI 53916.

17.    Approximately 30 minutes after NTOC received the tip submitted by J.B., NTOC received a second tip from "John Smith," phone number 484-858-0426, email address bigdubswww@gmail.com, which reported the same general facts regarding the swattings that J.B. had reported and that FOOTE was responsible for them. SMITH advised that the Toledo, OH swatting occurred at [Address 1], Toledo, OH, and that J.K. was swatted at [Address 3], Tracys Landing, MD 20779. SMITH also stated that FOOTE was involved in fraud schemes and made money from extorting pedophiles online. According to SMITH, FOOTE only had around $40,000 left due to his online gambling activity. SMITH stated that "we" have reported FOOTE multiple

---

[3] [Address 2], Temperance, MI was the residence of J.B., and the site of another swatting incident herein described.

times for a sexual interaction that occurred between him and a 12-year-old girl on Discord. SMITH provided the same email and home addresses as J.B. had provided.

18.    On January 31, 2025, J.K.[4] was telephonically interviewed regarding the swatting incident which occurred at his residence, [Address 3] Tracys Landing, MD 20779 on January 3, 2025. J.K. explained that he played video games online with a group of people which included himself (using the online moniker "Caspar"), J.B. (using the online moniker "Jesse"), and FOOTE. Two others were also in the group using the online monikers "Pablo" and "Hydra," but J.K. did not identify those individuals. J.K. came to believe that FOOTE had swatted him after PABLO provided J.K. with an undated recording of a conversation between PABLO and FOOTE in which FOOTE appeared to make several admissions. Portions of the comments made by Dylan were transcribed below.

   a.    "Wait, can I tell you the explanation behind it, though? [Unintelligible (UI)] promise you won't say shit. I paid someone $1,000 to do that."

   b.    "Do you know who else got raided? You know Yoda[5]? Yoda got raided as well. Jesse's[6] tonight. Jesse's getting raided later."

   c.    "… there's no proof, none of that leads back to me, I hope you know. We, we did that on BraveTalk. It's not able to be traced back."

   d.    "Do you wanna know why they believed it? Right? Cause we described how the house looked, everything. What cars were in the driveway, all that. Cause my boy, my boy's like, 'I'm in Maryland right now,' so I was like, 'alright, bet.' And so I got him to like go nearby.. dude you know I like had people on his property, right? I had like three people on his property take, take pictures of what the like, how to describe it and shit and what vehicles were in the driveway way and all that?"

---

[4] J.B. appeared to have provided an incorrect first name for J.K.'s in his above-referenced complaint. Similarly, J.B. appeared to have mistakenly provided that KITTLER lived in Virginia rather than in Maryland.
[5] According to J.K., "YODA" was another person FOOTE knew who also lived in Anne Arundel County, Maryland.
[6] J.K. stated that "JESSE" was a mutual friend of his and FOOTE's whose real name was J.B.

e.    "Caspar has so much money, why doesn't he just get me killed? I mean, bro, he always said I couldn't do anything to him, so. And that's not even the worst thing that's gonna happen by the way. If he actually has that much in crypto just know there's gonna be a crypto heist on his house."

19.    According to Anne Arundel County Police Department Incident Report 25-700226, [Address 3], Tracys Landing, MD 20779 (the residence of J.K. aka "Caspar") was swatted in the early morning hours of 01/03/2025. During the course of that incident, the unidentified caller described the house as having a white door and a black Toyota Tacoma parked in front.

20.    According to Monroe County Sheriff's Office CFS Log CFS2503045, [Address 2]., Temperance, MI 48182 (the residence of J.B. aka "Jesse") was swatted on the evening of 01/10/2025.

21.    According to Toledo Police Department Incident Number TOP25005165, [Address 4], Toledo, OH (the residence of J.B.'s brother, Minor Victim 1) was also swatted on 01/10/2025 43614.

## ACCESS DEVICE FRAUD

22.    On May 23, 2025, in response to legal process, Crypto.com provided records pertaining to accounts associated with FOOTE, including the following:

    a.    User ID: 24001009
    b.    Unique User ID: c4ab564d-6636-459d-b6c6-0f47f4e0019b
    c.    Legal name: DYLAN TODD FOOTE
    d.    Date of birth: 2004-09-11
    e.    Current email address: footdyl49@gmail.com
    f.    Current phone number: +19202100495

23.    Crypto.com also provided communications between the Crypto.com support team and a Crypto.com user, C.P., which took place between November 15, 2024 and December 6, 2024. During the correspondence, C.P. explained that there had been unauthorized charges against

9

his credit card number 4060 95** **** 1987 for approximately $31,000 in cryptocurrency. C.P. provided his credit card statements from Navy Federal Credit Union displaying the charges of concern to support his dispute. Ultimately it was determined that the details for C.P.'s card ending x1987 were obtained by a third party and used for unauthorized purchases within the Crypto.com network. Crypto.com explained that if an account holder's card details were compromised, the offender could put their name as the card holder, thus authorizing the charges.

24. During the course of the correspondence between C.P. and Crypto.com, Crypto.com provided a "Merchant Response Document" which detailed the cardholder information pertaining to credit card 4060 95** **** 1987, used to fund the disputed transactions. The cardholder information contained on the document was outlined below.

g. Name: DYLAN TODD FOOTE
h. Email: footedyl49@gmail.com
i. Phone: +19202100495
j. Product: Crypto.com App Services
k. Service: Fiat to DA Conversion
l. Card number: 4060 95** **** 1987
m. Amount: $1,544.85 USD [Agent note: this amount represents a single disputed transaction and does not represent the total loss amount.]
n. Processed at (UTC): 07/20/202 21:04:20

25. According to legal records provided by Crypto.com, Crypto.com Unique User ID (UUID): c4ab564d-6636-459d-b6c6-0f47f4e0019b[7] conducted transactions using information from approximately 35 different credit cards from approximately 25 different financial institutions between July 18, 2024, and November 9, 2024. Included among these transactions were over a dozen successful purchases of cryptocurrency between July 18 and 20, 2024, using credit card number 4060 95** **** 1987.

---

[7] This UUID is the one attributed to FOOTE as detailed in paragraph 22.

26.     According to legal records provided on June 9, 2025, and June 11, 2025, by Equifax and TransUnion LLC, respectively, their were no public credit records associated with FOOTE that would suggest a credit card opened in his name. Further, a Department of Workforce and Development (DWD) records query requested on June 3, 2025, indicated that no wages had been reported for FOOTE since at least January 1, 2024.

27.     According to legal records provided by Crypto.com, UUID: c4ab564d-6636-459d-b6c6-0f47f4e0019b conducted 14 withdrawals of cryptocurrency to one of the following two wallet addresses between July 18 and July 20, 2025:

      a.   Address: 1HXJ6d3U9owqT1uMgqzFxXKccWVRL8Uap8
      b.   Address: LUX7jCuVu7w1hp9xy2duUH4xp53pet2Bh8

28.     FBI Forensic Accountant analysis conducted on these wallets revealed that funds from those addresses were moved to the following organizations with the following respective Transaction Hashes[8]:

      a.   Duelbits.com[9]

          i.   910d00f36c3b45b1051dd541f96101b08579028280de719c70c3b4d75374a4ad
         ii.   f00d7ca8039d134004b15eae30a4b064e14b907b5468dd82e6a15f0a8641f2fa
        iii.   b3e2a5c5f9a5268ce490b62d138de4484e27f5cbf41f2c113273e2b1c29e6403

      b.   Shuffle.com[10]

          i.   e6dbeb62fdec9a13eddaedb5bdc701238d75cb022192b3cf7a5dd2836c54e40e
         ii.   13d25753b50ee8f1471cf225604a980576565ca8fd1361f96fb814609cda5235

---

[8] A transaction hash, in this context, is a unique alphanumeric string of text identifying a specific transaction on a blockchain.
[9] Duelbits.com is an online gambling platform
[10] Shuffle.com is an online gambling platform

       iii.   80245ccf24ebb5e5afa69de08bf99600edd808a888205dd6877296367a52a4
            f9

       iv.   80245ccf24ebb5e5afa69de08bf99600edd808a888205dd6877296367a52a4
            f9

c.  Cash App

       i.   f7ce6ec5d46db8ad8f1f6a7cb1cbaad7203422e3bbede7bc8d913770ae6a45
            3a

       ii.   4c78e6762f2ebfa61214c6455048a6e3b30a02915e78f297ab4adac7009df9
            9d

       iii.   7418333573c3530de23874a42de77e52f04b78b6512521ac11beaa7ed3b26
            221

       iv.   e237b9d534af53e2bd0f97c81b1e78d43486f7786cf6b91698868154573aff
            37

29.     According to records provided by Duelbits.com, the above-referenced wallet address and transaction hash data were associated with a customer account. Duelbits provided the following identifying information for that account.

      a.    User ID: a77bb9ec-74b9-5566-a58c-b4d978412b1d

      b.    User name: 👑 Chair 👑

      c.    Email address: rocksman233@gmail.com[11]

30.     Duelbits also provided instances of correspondence with the user. The following interaction took place on July 22, 2024, days after C.P.'s credit card ending x1987 was used to make unauthorized purchases of cryptocurrency on the Crypto.com platform.

      a.    10:48 AM | 👑 Chair 👑 : Agent

      b.    10:48 AM | Ace: Please provide as much detail as possible about the issue you're having, an agent will be with you shortly.

      c.    10:49 AM | 👑 Chair 👑 : Self ban

      d.    10:49 AM | 👑 Chair 👑 : I've lost 10s of thousands and wanna take a break

      e.    10:49 AM | 👑 Chair 👑 : before I keep deposing

---

[11] Email address rocksman233@gmail.com was found to be associated to FOOTE as described in paragraph 13.

31.     According to records provided by Block, Inc. (Cash App), the transaction hashes referenced above in paragraph 28(c) resolved to a single Cash App account operated by Dylan Todd FOOTE, date of birth 09/11/2004. Physical Cash Cards[12] associated with the account were mailed to 109 Sloan Circle, Beaver Dam, WI 53916, and email address footedyl49@gmail.com was also associated with the account. Additionally, on 04/24/2024, the accountholder uploaded a photograph of himself for account verification. Based on this affiant's familiarity with the case, the pictured individual was FOOTE.

32.     FOOTE's account attempted to link multiple financial instruments to the account between 04/09/2024 and 11/09/2024, most of which were declined for various reasons such as, "INVALID_COUNTRY," "CARD_LINKED_TO_TOO_MANY_ACCOUNTS," and "CARD_BLACKLISTED." One instrument, card ending x3305 from Navy Federal Credit Union, was successfully linked FOOTE's account on 10/12/2024 at 06:48:32 UTC. Immediately following this successful link, (11) attempts were made between 10/12/2024 06:48:33 UTC and 10/12/2024 22:57:07 UTC to transfer funds from the card to FOOTE's Cash App account. The dollar amounts for these attempted transactions ranged from $20.00 to $99,999.00. None were successful.

33.     Also included among the would-be linked financial instruments was card ending in x1987, belonging to C.P. The attempt to link C.P.'s card was conducted on 07/18/2024 at 11:24:56 UTC. Between 07/18/2024 13:45:24 UTC and 07/20/2024 11:46:2024, FOOTE made (10) successful P2P Transactions[13] totaling $4,654.99 to recipients "Mommabear" and "savanna foote."

---

[12] According to the provided records, a Cash Card is a card issued to the customer that can be used for payment transactions. They can be physical cards or virtual cards accessible within Cash App.
[13] P2P, or Peer-to-Peer, Transactions, represent the movement of funds between two users of the platform.

13

This affiant is aware that FOOTE has a presumed sister named Savanna Foote who has been observed by FBI surveillance teams at 109 Sloan Circle, Beaver Dam, WI on multiple occasions. Examples of the payments follow:

    a. 07/18/2024 13:45:24 UTC - $500.00 to Mommabear; Subject: "enjoy momma"
    b. 07/18/2024 13:51:38 UTC - $1,500.00 to Mommabear; Subject: "for phone and something else"
        i. According to the same records, a new device – an iPhone OS 18.5.0 with UUID EFCD8700-DC09-4357-92A0-58BD754B2F5F – was linked to FOOTE's Cash App account for the first time on 07/21/2024.
    c. 07/18/2024 14:01:23 UTC - $250.00 to Mommabear; Subject: "cam"
    d. 07/18/2024 19:43:07 UTC - $350.00 to Mommabear; Subject: "shopping"
    e. 07/19/2024 16:10:11 UTC - $200.00 to savanna foote; Subject: ":)"

34. During a telephonic interview with C.P. on July 9, 2025, C.P. could recall instances of fraudulent activity on his credit card. C.P. stated he initially learned of the fraudulent activity when he himself tried to make a cryptocurrency purchase with his credit card and the transaction was declined. C.P. confirmed he had a Navy Federal Credit Union account with a credit card number ending in x1987. C.P. stated that this card was cancelled, and that he was issued another card as a result of the suspicious activity on the first card. C.P. stated that the total loss was approximately $31,000, and that he was never able to recoup any of the funds. Around that time, C.P.'s bank provided him a document with someone else's name on it: Dylan Foote. C.P. explained he did not know Dylan Foote and had assumed that he was another victim of identity theft whose name was being used to mask the identity of the true perpetrator. C.P. confirmed that he did not give anyone permission to use his credit card, and did not authorize any transactions between July 18, 2024, and July 22, 2024.

**109 SLOAN CIRCLE, BEAVER DAM, WI 53916**

35.     According to Beaver Dam Police Department (BDPD) Incident Report B24-09507, T.F. called BDPD on September 9, 2024, to report a concern that her house, located at 109 Sloan Circle, Beaver Dam, WI 53916, would be swatted in the near future. T. FOOTE believed this to be the case because her home had been receiving unwanted DoorDash orders and believed that these items were being sent by former gaming friends of her son Dylan Foote. T. FOOTE further explained that Dylan's birthday was coming up next week, and she was concerned that these online friends would memorialize the day by swatting their house.

36.     On October 25, 2022, BDPD conducted a welfare check at 109 Sloan Circle, Beaver Dam, WI after receiving a report that FOOTE had knives and was threatening to harm his family. Jamie Foote, listed as FOOTE's father, stated that FOOTE was asleep and had been for some time.

37.     According to the Wisconsin Department of Motor Vehicles (DMV), Dylan Todd Foote was found to be associated to the following selectors:

     a.    Name: Dylan Todd Foote
     b.    DOB: 09/11/2004
     c.    Driver's License: WI – F3001780433100
     d.    Address: 109 Sloan Circle, Beaver Dam, WI

38.     On June 4, 2025, the FBI conducted physical surveillance at 109 Sloan Circle, Beaver Dam, WI. During the course of the surveillance, multiple family members of FOOTE's were observed to include J.F. and T.F.

15

## FRUITS, EVIDENCE, AND INSTRUMENTALITIES INSIDE THE SUBJECT PREMISES AND ANY CLOSED CONTAINERS AND ELECTRONIC DEVICES FOUND THEREIN

39.     I have learned through training, research and experience, that the commission of the SUBJECT OFFENSES in the manner described above necessarily requires the use of computers, smart phones, tablets, or other computer devices and storage media for the perpetrator to access cryptocurrency exchanges and wallets, connect with co-conspirators, and engage in transfers of digital currency. I have learned through training and experience that individuals who engage in the SUBJECT OFFENSES in this way also commonly maintain copies of software programs and other applications to assist with this activity, including, but not limited to, cryptocurrency client and wallet files, digital signature software and related authentication keys, as well as encryption software and related encryption keys. In such cases, I know that perpetrators often keep such electronic devices inside their homes. In the case of smart phones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks or protective sleeves.

40.     Because the crimes described above involved the use of cryptocurrency, the items to be seized could be stored almost anywhere within the SUBJECT PREMISES, in both physical and electronic formats. For example, Attachment B seeks cryptocurrency addresses, private keys, recovery seeds, and passwords. These pieces of data comprise long and complex character strings, and in my training and experience I know that many cryptocurrency users write down or otherwise record and store such items because they are too long to commit to memory. As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence. For all of the foregoing reasons, your affiant respectfully submits that probable cause exists to believe that such records, data, and documents will be found within FOOTE's residence, including in computers or on other devices that store electronic data.

16

41.     Furthermore, I have learned through training, education, and experience that computers used in furtherance of criminal activity can hold evidence of the criminal activity months (or even years) after the crime occurred. This is typically true because:

a.   Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b.   Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

c.   In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

42.     Accordingly, and based on all of the above, I submit that there is probable cause to believe the SUBJECT PREMISES and any closed and/or locked containers found therein will contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, and will also contain

17

the electronic devices that will (and will, in and of themselves, constitute) further evidence, fruits, and instrumentalities of the SUBJECT OFFENSES.

# ATTACHMENT A

## Property to be Searched

The property to be searched is the premises, attached garage, and outbuildings located at **109 Sloan Circle, Beaver Dam, Wisconsin 53916** (the "SUBJECT PREMISES"). The premises a single-story, single-family residence located in a cul-de-sac east of the intersection of De Clark Street and Sloan Circle in Beaver Dam, Wisconsin. The residence is green with a brown shingled roof, a one-car attached garage, and a fenced-in backyard enclosing an above-ground pool, a shed and a small greenhouse. The front door is located south side of the residence facing the driveway which opens onto Sloan Circle. Near the front door is a mailbox clearly labeled with "109." The driveway connects Sloan Circle to a single-car garage attached to the residence.



19

**ATTACHMENT B**

**Information to be seized by the Government**

1. The items, information, and data to be seized from the location[s] described in Attachment A are fruits, evidence, contraband, and/or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1029: Fraud-Access Devices; and/or 18 U.S.C. § 1957: Money Laundering, as described in the search warrant affidavit, including, but not limited to:

      a.    Records and information related to the purchase, sale, possession, use, transfer, or exchange of cryptocurrencies, or the location, address, balance of any cryptocurrency assets or accounts;

      b.    Passwords, private keys, or seed phrases associated with any cryptocurrency assets;

      c.    Cryptocurrency wallets, to include digital wallets, cold storage wallets, paper wallets, or any other form of storing public and/or private keys associated with cryptocurrency assets;

      d.    Records or information related to the creation or use of cryptocurrency accounts, wallets, or addresses;

      e.    All documents listed for financial transactions, communications, names, accounts numbers, phone numbers, or other personal identifiers;

      f.    Records and information related to the identity or location of potential victims, witnesses, co-conspirators, or suspects involved in financial fraud schemes;

20

g.     Records and information related to communications with legitimate cryptocurrency exchanges or other cryptocurrency companies;

h.     Records and information related to Dylan Todd Foote's taxes, finances, and/or any movement of funds, to include data, records, images, documents, programs, applications, or materials tending to show the use of bank accounts, credit card accounts, or other financial accounts;

i.     Personal checks, cashier's checks, deposit slips, check stubs, wire transfer forms, promissory notes, or any other documents demonstrating a transfer of funds from victims or potential victims to Dylan Todd Foote or from Dylan Todd Foote to co-conspirators or potential co-conspirators involved in financial fraud schemes;

j.     Evidence indicating Dylan Todd Foote's state of mind, or that of any potential co-conspirator, as it relates to the crimes under investigation;

k.     Digital devices or storage mediums used as means to commit the violations describe above, to include but not be limited to, cellular telephones, any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to accessing cryptocurrency assets;

l.     For any digital device or storage medium whose seizure is otherwise authorized by this warrant, and any digital device or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Digital Device"), in addition to the items

21

described in paragraphs 1(a)-1(k), above, the following items will be searched for and seized from these Digital Devices:

      i.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to financial fraud schemes;

      ii.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any money or funds obtained from any individuals or entities;

      iii.      All emails, texts, chats, other communications, documents, photos, videos, and other items or information relating to any efforts to obtain money or funds from any individuals or entities;

      iv.      All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any financial transactions, transfers, or deposits of funds, cryptocurrency, or purchases of assets or cryptocurrencies;

      v.      Evidence of who used, owned, or controlled the Digital Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat", instant messaging logs, photographs, and correspondence;

      vi.      Evidence of software that would allow others to control the Digital Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

vii.     Evidence of the lack of such malicious software;

viii.     Evidence indicating how and when the Digital Device was accessed or used to determine the chronological context of Digital Device access, use, and events relating to the crime under investigation and to the Digital Device user;

ix.     Evidence indicating the Digital Device user's state of mind as it relates to the crime under investigation;

x.     Evidence of the attachment to the Digital Device of other storage devices or similar containers for electronic evidence;

xi.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Digital Device;

xii.     Evidence of the times the Digital Device was used;

xiii.     Passwords, encryption keys, and other access devices that may be necessary to access the Digital Device;

xiv.     Documentation and manuals that may be necessary to access the Digital Device or to conduct a forensic examination of the Digital Device;

xv.     Records or information about Internet Protocol addresses used by the Digital Device;

xvi.     Records of or information about the Digital Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

23

xvii.   Contextual information necessary to understand the evidence described in this attachment.

2.   As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of digital device or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies).

3.   The term "digital device" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4.   The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMSs, and other magnetic or optical media.

5.   This warrant authorizes a review of electronic storage and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

24

6.      During the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized  to compel the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) from Dylan Todd Foote at the time of the execution of the warrant, if necessary, to unlock any devices requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristic will unlock the device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

   a.      Any of the devices found at the Subject Premises or on the person of Dylan Todd Foote;

   b.      Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant;

7.      While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned

25

person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any devices or to identify which biometric characteristic (including the unique finger(s) or other unique physical features) unlocks any Devices, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.